Robert Anderson, who I apologize for the stop motion. Michael J. Kirschberg, counsel for athletes Allen Ivar, Jacob Ivar, and David Lerch. Alright, Mr. Anderson, do you wish to reserve any questions? No. Yes, Your Honor. Thank you. Five minutes. Thank you. You may proceed. If it may please the Court. Mr. Kirsch and I were here almost three years ago. A panel at that time issued a decision or a memorandum about two and a half years ago. And with a lot of guidance, I was impressed. I mean, I didn't like it that much, but I was very impressed with all the guidance that that court gave to the bankruptcy judge. And so when then, several years later, the new findings came out, as I have indicated in my briefs, I believe there were quite a few unaddressed issues and points that the BAP, if I may use that term, had pointed in that to this day are unaddressed. And I believe the biggest item is the issue of approximate cost. Nothing really said about it. Either in her first statement of decision or in the new findings, there was virtually nothing said about the issue, which is as important an issue as misrepresentation or knowledge of falsity or anything else is approximate cost. And especially in this case, I think it is a huge item. And I've gone at length in my briefs about that issue. There's something else, and there was virtually nothing about knowledge of falsity, intent to deceive. The junior liens, I think, was virtually nonexistent in light of the reasons why the bank shut down the operation. It had nothing to do with loan terms. It had to do with second trustees put on the property that the bank already had a lien on, and it was just ridiculous. We probably shouldn't call it the bank, though, should we? No. Point Center Financial Lender. And wasn't that a default under the terms of the Point Center document? I mean, you may think it's unwise for them to do that, to enforce it, but it was a default, right? It was a default at the discretion of the lender, as testified to by Mr. Esparza in the trial. All defaults are at the discretion of the lender. Lenders can always waive defaults or defer. As a matter of fact, before they issued that default letter, they were in the process of working out a refinance of the loans, and then in the process they discovered these second trustees, and then that's when the whole thing was shut down. The whole idea of these four homes being built and then someday being sold and then lots of profits being split among a lot of people, why didn't that happen? It happened for one reason, because of the second trustees on that security of the lender, and then they shut it down. It was a little more complicated than that in the record, wasn't it? The representative from Point Financial testified that they were concerned about why, given the budget, they would need the additional funding, and there was a dispute, but that representative also said he was pretty concerned about how far behind they were on that schedule, although your client obviously disputed that. So it wasn't just the fact that there was another encumbrance. Do you disagree? Well, I think that was the biggest reason was the encumbrances, and then when they noticed that, I think they then said, well, wait a second, they're also behind schedule, and they're also this or that, and then they made a decision using their discretion, but it wasn't a knee jerk. They had to default them, and their representative agreed with me on that in the trial. The other thing that the court did not really pay, I don't think, enough attention to, that the BAP did point to somewhat was the operating agreements. Can I take you back to approximate cause for a second? I mean, this looks to me like basically a fraud in the inducement kind of case. These people testified that they would not have invested if they'd known the true facts. So my view is their loss was when they laid out money in reliance on the false statements. Why do things that happen after that really matter? Why does there have to be a further showing of cause? Well, first off, there has to be the false statements, and in this case, Wickham said nothing. Anybody testified, all the people that testified, there was no one that said Wickham said something out of his mouth that was false. There was the idea, it was their understanding, and Roche couldn't even say who told him that Coral Blue was going to hold title, but that changed. And when each of the plaintiffs agreed to the operating agreement, they weren't going to be part of any of this unless they agreed to the terms of the operating agreement. That's how they began to become people who may someday have earned some money back. The agreement in the operating agreement is central here, because when they agreed to the terms and conditions of the operating agreement, they gave to Wickham and Werner authority, exclusive management authority, to make the decisions about, first off, the lender was already in place, and it closed a couple of weeks after the IVAR showed up. If there was fraud to the inducement, I understand you dispute that there was fraud to the inducement, but if there was, if they were fraudulently induced to sign the operating agreement, then the disclaimers and agreements in the operating agreement wouldn't really help your clients at all, right? That agreement would be invalid because of the fraud to the inducement. If it was real clear that there were misrepresentations that were material that had to do with the project, then like in any other fraud case, I would say yes. What about the statements regarding, so kind of the reason going back to saying we can't call it the bank. There's one of the issues in the case is who was the lender, and was it a conventional lender or other? And the statement is made, or the allegation is made, we were told it was conventional lender, which indicates certain issues, and in fact it was an entity that's far from conventional in its lending approach. It's not lending its own money. It's subscribing. It's not a bank. Why is that not a material faults omission or representation? Because the reason they gave, realizing that it was a hard money lender, the reason they gave was because that then communicated to them that this was not that great of a creditworthy operation. Okay? That's why I go back to the operating agreement. They agreed in that operating agreement that it was a risky operation, that they had no financial history to speak of, and all of that was in writing ahead of time. And so when they accepted the terms of that operating agreement, they went in with their eyes wide open. For whatever reason, down the road, they looked backwards and go, oh, it was a hard money lender. We wouldn't have done it if we'd have known that because that would have told us they didn't have that great of credit. Well, when they signed the operating agreement, they were acknowledging right up front to become part of this investment operation that they didn't have a lot of credit. They agreed that that was okay. So it's not a valid, real concern that they, in fact, would have not done it. They were told in black and white they didn't have creditworthiness. And they went ahead and signed the operating agreement and made their investment anyway. So how were they supposed to realize any money from Coral Blue? Well, they had the operating agreement. And how's the operating agreement turned into money since Connexion owns the property? It was a contractual agreement with these parties. Is that contract in the evidence? Well, no. I'm talking about the operating agreement. No. So how do you get money from Connexion to Coral Blue? Coral Blue doesn't own anything. Coral Blue didn't operate anything at that time, correct? Okay. Well, as far as the IBARs go, they had the very same amount, $216 promissory note from Connexion. Well, let's put that aside. How is Coral Blue going to generate any profits based upon that situation as existed in reality, not as represented at that time? You know, none of these people asked my opinion about that, for instance. And point me to the record. Your Honor, I look at that operating agreement, and if I'm representing the investors, if there had been profits, I would have said, okay, there's a bank account over here, Connexion's bank account where all of the profits went to, but we have this operating agreement which is our written agreement about what was going to happen. Between themselves. Between themselves and including Wickham and Werner. What right or asset did they have at that time that would suggest, or business, that they had anything of value that would be used to turn that entity into a profitable situation where the members would receive distributions? The value of the promises that they were going to be, there had to be something in there about splitting up profits down the road. It was discretionary with Wickham and Werner. But when there's good faith, which I hope Wickham and Werner had, they finished the homes, sold them, said, ooh, we've got $3 million here to divvy up. I would only hope if they asked me for advice, I'd say split it up fairly. First be sure every investor gets all their money back, and then divide the rest of that up 10, 15 different ways or whatever. You're into your five minutes, so I'm going to. I'll sit down. Thank you. Mr. Parras. Good morning. If it may please the court, you've read the briefs. You've looked at it. I'm here to answer any questions. No need to rehash what's in there. I believe you have a very good understanding of the transaction that took place. But there's still holes in the findings? It was a very tedious process. I believe the record's in front of the court. There was probably about six months of submission to the bankruptcy court and multiple hearings on the matter. The reason we're here is because the first decision, which your Honor was on that panel, was wholly deficient, brought in issues of breach of fiduciary that weren't even addressed. It just was what it was. At the end of the day, what we have is an investment that was based on misrepresentations and omissions. The deal fell through 12 months later because the loan was in default. Can I stop you on that word, omissions? One of the concerns I have, I think we all have about the findings, is there aren't really any findings that would support, explicitly anyway, a duty to disclose. If there's an omission, you have to have a duty to disclose to back that up. Are there findings that would support the imposition of a duty to disclose? I believe in any business transaction you have where one person has knowledge of the information and the others don't, you have that duty. But do we have a finding about that? We know the law. We're just looking for the judge below. Did the judge below? The judge alongside. We prefer to say below. Yeah, I know. Well, the person before us in time, our predecessor. I believe the duties implied in the finding that Wickham was aware of the fact and that he didn't disclose it and that the IVARs and the Roche relied upon that fact. Again, if we look back to one other important fact, I know this was discussed in one of your questions to Mr. Anderson regarding the conventional loan or hard money, the evidence is in the record and it's discussed in examination about why the defendant or the defendant companies didn't go with SunWest Bank, which was a 21-month loan, I believe, or 23 months, significantly more than the one they went with. And, you know, at the end of the day, I don't think any one of us, if we knew that you had to build these two homes, get them on the market and sell them within 12 months, would have given our money. That is an important fact that the investors had a right to know, just as they had a right to know that the loan wasn't fully funded. You know, my wife has been watching this American Greed on TV, quite interesting stuff, and as I was sitting there last night putting some thoughts together, I looked at that and just said, you know, this is one thing where from the very beginning of it, the defendants, Mr. Wickham, Mr. Warner, had one thing in mind, which is basically to make a profit without any money. They went into this transaction with $750,000 to, in essence, build what was going to cost them $13 million, and they relied on everybody else. And remember, if you look at the timing, RSD was going to come up with the other $400,000. They'd already had three extensions to their purchase on the property because they couldn't come up with the appropriate funding. Within 30 days, they raised the other $400,000, the $216,000 from the IVARs, the $200,000 from Mr. Roche, and within days of getting Mr. Roche's money, the transaction closed. They needed this money. They weren't going to tell them anything that would hurt them getting that deal, and they did everything they could not to tell them. What did they do? They took them on big grand tours of houses to show them how great they are. You know, and you have Mr. Wickham at the end of the day, who unfortunately has a problem telling the truth, you know, in terms of financial affairs, the bankruptcy court omits $500,000, tells the bankruptcy court in his declaration that he's a successful builder making over a half a million dollars before this transaction took place when that wasn't true. You know, one problem after another, at the end of the day, the judge heard this, saw it, determined that these were material facts that any reasonable investor would want to know. She felt that they should have disclosed that information to them and didn't. To what extent do we have the latitude to fill in any blanks that we see? Well, to the extent that it is de novo from the standpoint of the conclusions of the law which you're asking about regarding whether or not there's a duty. Without that, I guess we can send it back down for one more time regarding, you know, specific finding as to whether she found there was a duty to disclose that. That raises a question. Is it a question of law or a question of fact? The existence of a duty to disclose, is that a question of law or a question of fact? I don't know. I think you can find it as a hybrid. I think the first part of it comes down to whether or not the fact is material, and that's a finding that the judge did find. These were material facts. And at that point in time, if they are material facts, then the party who has the information has to disclose it. Your Honor, I want to sell you my Rolex. I know it's not a Rolex. You don't know any different. I have a duty to tell you that. I want to lend you this. I want you to lend me a million dollars to buy this property. Oh, by the way, if I don't get them built in a year, we're losing everything. I have a duty to tell you that. That's just common decency. That didn't happen. You indicated that as the omissions, these were omissions of facts that anybody would want to know. That kind of begs the question why the question wasn't asked. The record supports the inference strongly that your clients knew there was financing out there, and they placed tremendous significance on the fact that it was conventional, or in the words of Mr. Roach, it was regular. There's no finding as to what that meant. There's no finding that a one-year loan at this stage of the development was irregular. So why does the objective nature of that save your clients when they did not ask those questions that any reasonable person would ask? Well, I think it also goes to the tally of the circumstances. You brought up, I believe, the issue regarding the ownership structure dealing with Coral Blue. This whole thing was presented as this grand plan, and they were sold a bill of goods and told we got conventional financing. They were shown great pictures of things. They were told all these great things in the height of the market. It's not the obligation necessarily to be a sophisticated investor and to do an exceedingly great investigation of it. I mean, truth be told, there's some discussion in here regarding the Marabu project that Mr. Wickham, I mean, Mr. Ivar had invested in. Truth be told, Mr. Roach was asked to invest in that, and I told him don't do it. There was as many questions that should have been asked on this deal that at least I asked on those. These are not sophisticated investors. They were told something. They believed it. They didn't know what questions to ask. Is that a blank check for everything, though? I think had they been told this information that, by the way, we're not going to put the property in the name of the LLC. So the LLC is really a shell. It means nothing. By the way, we're going to take all the money we get. We're going to co-mingle our other accounts. So there's no assets in the LLC. About the title, I mean, at some point the Ivars were on notice that Connection had title, right, because it was Connection that offered the deed of trust on the property. That was in the second or the third loan. I've forgotten which now. I guess I would have to say that you're responsible for what you sign and read, but I can tell you that they didn't appreciate it. That's not necessarily an excuse, but it is the reality of it. There are a lot of documents presented in front of these people, just as you have two separate operating agreements, one with different members of them, one with others. I mean, take a look at the second Coral Blue investment. How do they create a second Coral Blue when all these other members of Coral Blue I are already members of it? I mean, these are documents flowing across the place. They think these are legal. They think this is proper. Are they ignorant? Did they not exercise the best of judgment? Probably. But that doesn't relieve Mr. Wickham. Well, is that the difference between omission and representation then? Because for representation it has to be justifiable reliance, so there's some inquiry there. Omission, maybe you get to rely on materiality. But is that right? You can't make an informed decision without having all the facts available to you. And if somebody withholds that from you, to what extent are you going to have the inquiry? They could have asked. But where does the responsibility come? Where is it that these are unsophisticated versus these are blind and greedy? Who knows if your clients are? But where is the ostrich in this continuum where you just turn a blind eye and the loss happens and now you are defrauded because you are unsophisticated? Well, I think if we take that position, we're rewarding the fraudster for basically being creative and outsmarting them. Or are you not meeting your element? I believe when you have an omission, the obligation and the duty belongs to the party who has failed to represent that and failed to provide that. You can't ask what you don't know. One of the problems the first time we had this was that we have different transactions. And one of the things we required was you can't simply take this bundle of stuff and say fraud. And there's been some attempt to parse it out. But going back to the connexion point, so we have first transaction, we have the second transaction with a different person, and then we have this sort of unusual transaction where I don't think there's any omission regarding title there because they provided a trustee that says who owns the property. So that's not an omission at that point in time, I don't think. Are you arguing that if I hand you a document that on its face discloses which entity has title, that I also have to say, oh, by the way, this entity has title? And I believe it should be noted from our arguments in our opening brief. I'm not resting on the issue of title. I think that's a point to demonstrate the lack of veracity or truthfulness from the Connexium and Coral Blue parties. I think the issue comes down to the loan terms. You know, when they walked into this, as Judge Ferris indicated, you know, that, you know, it was an inducement. They were told we have conventional financing. So everything that happened after that point was based on this fraudulent house of cards that was a misrepresentation or an omission of some information the parties needed to know. The minute that they handed that money, they're believing that there's conventional financing. They're believing. What did that mean? First of all, you agree that there's no evidence in the record what conventional financing meant. You know, I don't know that I would totally agree with that. It went to the creditworthiness. But they did apply at SunWest Bank. But SunWest Bank, they didn't know that? There's no evidence that your investors knew that. I believe not within the record before you, but there was testimony at depositions that they threw out names such as Bank of America and things of that nature. But they still had to make payments. If they invested in Coral Blue on conventional lending, they still had to make interest payments because they would suggest conventional lending would require monthly interest. Well, actually, in this situation, the payments are taken from the amount of money borrowed. So there aren't any actual payments. But I understand that's the interest reserved. But that's the problem with this is there's nothing in the record that indicates what conventional lending was, such that that is the proximate cause. The proximate cause is not the conventional lending. The proximate cause is that this loan at 12 months failed. End of story. In 12 months, this loan failed. They defaulted because the houses had not been built and not sold, and they didn't pay the balloon payment. That's what happened. And nobody was told, by the way, you have 12 months to build two multimillion-dollar homes. Get them on the market and sell them. That's it in a nutshell. All these other things go ultimately in the day up to the credibility and goes to the entirety of what took place in the transaction. But was it unreasonable to expect? I mean, there's nothing in the record that suggests that it's unreasonable to build the house in a year. That goes to the points where aren't there still holes in this? I believe Mr. Wickham testified that he wasn't worried about it because he was expecting they would refinance the property. So he knew that it wouldn't be done in 12 months. I hate to interrupt, but I thought the gentleman from Point Finance said that he was comfortable with the 12-month on this. It probably goes back to a prior counsel before you thought that Mike Russell's ball broke, too. My problem is that they didn't sit there and just work on the two homes. They went off to Maribu, Colorado. They went every place else. So, I mean, who knows what would have happened. But the reality comes down to it is if I'm being told that, look, by the way, you're going to put in this money and we've got to build these in 12 months. And if we don't and we don't sell them in 12 months, if we don't get our money back and pay this $5 million balloon payment, we lose everything. I want to know that. And I think you would, too. And that's a material fact. And that's a fact within the knowledge of Mr. Wickham that he didn't disclose. The plaintiffs testified they had multiple meetings with him. He testified that he didn't talk about any of the loan terms. They had a right to know that. Everything else, you know, was it material regarding the ownership of Connexum or Coral Blue? You know, we could set that aside. We could look at that one fact only out of 12 months. And at the end of the day. So, I'm going to. You've got a few seconds left. I apologize for monopolizing this. So, where is it that they understood what the loan terms were when they invested? Because that seems to be something that anybody would want to know before they gave money over as to what the terms were, given that they knew that there was financing ahead of them. I believe that's where you tie in the statement regarding conventional financing and the implications that were made by that. Again, you have to take everything into totality. You know, they go through these grand tours, these $20 million homes that the builder built. They're told all these great things are going to happen. And they said, don't worry about it. We have conventional financing. They're given this representation. That's a false statement. There is no conventional financing. It's a hard money lender. And then they omit the fact that, oh, by the way, it's only 12 months. Oh, by the way, it's not even fully funded. Oh, by the way, we have a balloon payment. Thank you. Yeah, that's fine. I appreciate your time. Thank you very much. Thank you very much. All right, Mr. Anderson, we gave a few minutes there, so we'll give you a few extra here as well. Thank you. One minute. When the IVARs and Roche first got involved, the loan was in place. It closed shortly thereafter. They got the operating agreements and agreed to the terms of the operating agreements, among which said they gave exclusive authority to Wickham & Warner to determine things like what lender and everything else about managing the project. They had their eyes wide open, and they said, we are going to do it. And it also says you have received all the information that you need to make this decision. That's in English in the operating agreement. They signed it and said we agree. So is it your position that if there were any fraudulent statements made before that date, the operating agreement effectively waived those claims? Your Honor, I don't believe there were any fraudulent statements made at that time. I understand that. But if there were any, is your position that they're waived? If it was a fraudulent statement about a genuine bona fide material fact having to do with the project, then I think that would be a problem. But that isn't the case here. The project here was not a loan. The project here was, did Wickham have the ability to build these homes? Is this location in Ladera Ranch a good location for homes to be built and then to be sold? And remember, this thing didn't collapse because of a hard money lender and whatever that meant in terms of interest rate or whatever else. It didn't collapse because there wasn't quite enough money in the very beginning to fund the entire thing. That isn't why it collapsed. It didn't collapse because it was a balloon payment, because the record is and the testimony was by the lender and by admitted facts, is that they were working towards a refinance at the end of that 12-month period. They were in the process. It wasn't a drop-dead moment when that 12-month period terminated. They were working out a refi because everybody wanted this thing to succeed. Everybody wanted the homes to be completed, including the lender. The only reason why this collapsed is because of the second trustees that were out of contract put on that property. And the lender then said, whoa, wait a second. In their letter to Joe Warner, it wasn't even Wickham. Wickham didn't even know about it. This was a letter to Joe Warner that telling him that we are defaulting this loan, not because you guys are behind schedule, no, we're defaulting the loan and freezing the money because you have put second trustees on the lot. That is the reason and the only reason from the lender. I want to ask a variation of Judge Ferris' question. Judge Ferris asked you, you have the operating agreement where they made certain agreements, and he asked you whether that would have obviated the effect of actual fraud, fraudulent statements. You said no fraudulent statements. What would have been its impact on omissions that otherwise would meet the standard of a fraudulent omission? Well, the problem in this case is that the operating agreement gives exclusive managerial authority to Wickham and Warner to make decisions, all decisions regarding the project, so that they aren't asked and they don't divulge unless there's a duty to. And I don't see that there was ever here a duty on their part to do that. Well, assuming there was a duty prior to signing that document to provide information. It wasn't provided. Is it your position that that agreement then obviates the impact of an omission where duty existed? Well, I would take the position, if you're asking me very hypothetically. That's the advocate for your client. My position would be, did you read the operating agreement? Did you not give complete authority to these men to decide which way this boat is going to go? Well, yes, we did, but we didn't know. But you didn't have to invest here. And you didn't have to do anything with these people. But they said, these are the rules and this is what you've got to agree to. And if you do, maybe you need to check us out better before you hand us all that money. But they were fine doing it anyway. The lender was fine loaning them the money. They didn't have any qualms about it, even though they were a little underfunded. They still did it because they thought it was a good situation. And there were another probably 25 investors as well who also decided this was all a good situation. And, after all, when's the last time Orange County had a collapse that wasn't a good situation for real estate development? Further? All right, thank you very much for your good arguments. Thank you very much. This will be submitted.
judges: Taylor, Faris and Spraker